# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**RICHARD MASON,**                                   Case No. 1:18 CV 1737

     Plaintiff,

     v.                                   Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                                   MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Richard Mason ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for SSI in April 2012, alleging a disability onset date of April 1, 2011. (Tr. 157-60). His claims were denied initially and upon reconsideration. (Tr. 116-18, 122-23). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 126-27). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on February 9, 2017. (Tr. 61-90). On August 24, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 26-38). The Appeals Council denied Plaintiff's request for review,

making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on July 26, 2018. (Doc. 1).

FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1996, Plaintiff was eighteen years old on the date of his application, and twenty on the date of the ALJ hearing. *See* Tr. 37, 157. Plaintiff had completed high school, in special education classes. (Tr. 74).

Plaintiff testified that he believed he was unable to work because his mind "wanders" and it was difficult for him to stay on task. (Tr. 70). He worked for a brief period at Burlington Coat Factory; the school got him the job and his teacher filled out his job application. (Tr. 71-72). His job was to "restack the shoes". (Tr. 72). Plaintiff testified that he was supposed to work for two weeks, but "didn't make it because they told [him] that they couldn't have someone that couldn't focus because [he] would always get off task." (Tr. 73).

On a typical day, Plaintiff tried to clean, but his family told him that he was frequently off-task. (Tr. 74). He also sat on the couch, read books (though he had to re-read passages frequently) (Tr. 74), and played games on his phone for two to three minutes at a time (Tr. 84). Plaintiff's step-mother tried to teach him to cook, but it went poorly because he would "get[] off task and just walk[] away." (Tr. 76). Plaintiff made sandwiches and used the microwave. (Tr. 77).

Plaintiff testified he had difficulty getting along with people because he often did not understand them, and that made him upset. (Tr. 79). He yelled less after starting medication. *Id.* He had one friend who he saw rarely. (Tr. 80).

Plaintiff had a period of time where he did not receive mental health treatment, but had returned the previous year because he as "getting out of control", "yelling, screaming at [his] stepmom, and would get off task." (Tr. 78). At the time of the hearing, he was taking Lexapro to help him focus and another medication to help him sleep. *Id.* He noted both helped somewhat. *Id.* However, he could not focus well enough to prepare a meal on the stove. *Id.*

Relevant Record Evidence

Plaintiff's school records reveal low average reading scores, and low to very low math scores. *See* Tr. 213-14 (September 2012 evaluation team report). Based on this, Plaintiff was noted to need continued interventions and an individualized education program ("IEP"). (Tr. 214). His teacher described him as easily distracted, and easily frustrated. (Tr. 221). An October 2012 IEP placed Plaintiff in a special education classroom for core classes "due to his cognitive abilities and to limit distractions so as to provide the opportunity for intensive and direct instruction." (Tr. 202). In May 2013, his IEP described difficulties with peer relationships, and continued easy frustration. (Tr. 388). A June 2014 progress report noted Plaintiff showed improvement in controlling his behavior, but he was frequently off-task and displayed attention-seeking behavior. (Tr. 260). In April 2015, when Plaintiff was in twelfth-grade, he read at a fifth-grade level and worked at a fourth-grade math level. (Tr. 717-18). He was passing his classes with low grades. (Tr. 718).

In April and May 2015, Plaintiff received vocational services from the Bureau of Vocational Rehabilitation and was placed in a two-week-long job at Burlington Coat Factory stacking shoes. (Tr. 269-81). Plaintiff attended only 50% of his workdays due to his own illness and his mother's illness. (Tr. 281). He arrived early on the days he worked and he was appropriately groomed. *Id.* His relationships "were appropriate and relevant", but he required

some direction "when task changed or when he became bored with a task." *Id.* He was able to adapt to changes "yet lets it be known what he prefers and will accept change with demonstration." *Id.* In his ability to work independently, the evaluator noted he "[r]equired some guidance". *Id.* Under both work quality and quantity, he was noted to "require[] direction", but he worked his entire shift. *Id.* The Bureau of Vocational Rehabilitation subsequently sent Plaintiff letters discharging him from the program because he failed to respond to their attempts to contact him. (Tr. 282-84).

In June 2015, Plaintiff underwent a psychological consultative examination with Deborah Koricke, Ph.D. (Tr. 400-08). Plaintiff reported he was applying for disability because he had "trouble concentrating and acting impulsively." (Tr. 401). Dr. Koricke reviewed previous education records which showed Plaintiff had a full score IQ of 71 and that it "was noted that he is easily distracted and shuts down when he is frustrated." *Id.* Plaintiff reported past psychiatric and counseling treatment from ages five to seventeen, but that he was not currently being treated. (Tr. 402). On examination, Dr. Koricke observed Plaintiff was cooperative, interactive, had no deficits in attention, and had adequate memory. (Tr. 403). "He put forth consistently good effort on all tasks and persisted to the ends of time limits, producing valid results." (Tr. 403-04). He was not anxious and showed no outward signs of depression. (Tr. 404). His mood, affect, and energy level were normal and his eye contact was good. *Id.* His cognitive functioning showed he was only able to perform simple mathematical computations, his ability to abstract was below the mean, and he was unable to complete serial sevens. (Tr. 405). He had adequate insight and judgment, "consistent with borderline IQ functioning." *Id.* Dr. Koricke assessed oppositional defiant disorder, cannabis use disorder (moderate), and borderline intellectual functioning ("by ETR report"). (Tr. 406).

Plaintiff underwent a second psychological consultative examination with Dr. Koricke in September 2015. (Tr. 410-16). He reported his grandmother had lied during the previous interview. (Tr. 411). Plaintiff described depression and difficulty being around people. (Tr. 412). On examination, Dr. Koricke noted Plaintiff was "difficult to engage" and "was easily off topic and needed to be prompted to stay on task." (Tr. 413). He had difficulty understanding complex instructions and tracking conversation. *Id.* He had difficulty understanding simple or complex questions and "exhibited simple speech patterns consistent with difficulties with a borderline IQ." *Id.* Plaintiff's affect was blunted and agitated and he appeared uncomfortable and anxious. (Tr. 413-14). Dr. Koricke observed Plaintiff's intellectual ability to be in the borderline range, and noted he had a "limited frustration tolerance and had difficulties persisting." (Tr. 414). He had limited insight and judgment into his situation. *Id.*

In February 2016, Plaintiff underwent a mental health assessment with social worker Katy Kekic. (Tr. 420-26). Plaintiff reported depression, poor sleep, low energy, and anger. (Tr. 420). He stated he had stopped taking medication four years prior. *Id.* On mental status examination, Ms. Kekic noted Plaintiff was adequately groomed, oriented, and had cooperative behavior. (Tr. 424). His speech had a normal rate and flow "with noted poverty", and his thought processes were logical with tight association. *Id.* Plaintiff had fair judgment and insight, adequate memory, and sustained attention span and concentration. (Tr. 425). His mood was depressed and overwhelmed, and his affect was congruent. *Id.* Ms. Kekic assessed unspecified depressive disorder, rule out intellectual disability, rule out post-traumatic stress disorder. *Id.* She recommended pharmacologic management and referred Plaintiff to Dr. Fajobi. (Tr. 426).

At a visit later that month, Olufunke Fajobi, M.D. noted similar mental status examination findings (Tr. 435), and diagnosed unspecified episodic mood disorder, mild

intellectual disability, and a history of ADHD and bipolar disorder (Tr. 436). He started Plaintiff on a trial of Abilify "for mood lability and impulsivity." (Tr. 436).

Plaintiff returned to Dr. Fajobi in March and May 2016. *See* Tr. 441-43, 448-50. At both visits, Dr. Fajobi noted Plaintiff had a depressed mood and blunt affect, as well as questionable judgment and insight. (Tr. 442, 449). His attention/concentration was sustained, and his memory was within normal limits. (Tr. 442, 449). His thought process was logical and organized with no evidence of delusions, and his speech was spontaneous with a normal rate and flow. (Tr. 442, 449). In March, Plaintiff reported his mood swings were better and he was amenable to starting therapy. (Tr. 442). Dr. Fajobi prescribed a trial of Geodon (Tr. 442-43), but in May, Plaintiff reported he only took one dose due to side effects (Tr. 449). Plaintiff reported his mood fluctuated in response to stressors or conflict, and he retreated to his room in response. *Id.* His step-mother reported that Plaintiff "gets so anxious that he 'passes[]' out." *Id.* Dr. Fajobi prescribed a trial of Lexapro. (Tr. 449-50). Dr. Fajobi also noted a "detailed discussion about the need for therapy, coping skills." (Tr. 449).

*Opinion Evidence*

*Treating Physician*

In January 2017, Dr. Fajobi completed a mental impairment questionnaire. (Tr. 811-12). Therein, he noted he saw Plaintiff four times (February, March, and May 2016, and January 2017). He listed a diagnosis of unspecified episodic mood disorder and noted Plaintiff took Lexapro daily, and melatonin at bedtime as needed. (Tr. 811). As the clinical findings in support of the severity of Plaintiff's mental impairment, Dr. Fajobi wrote: "Alert, oriented x 3, cooperative, speech normal rate and tone, thoughts logical, organized, with poor fund of knowledge, mood euthymic, affect appropriate." *Id.* Plaintiff's prognosis was "guarded" and Dr.

Fajobi opined his impairment had lasted or was expected to last at least twelve months. *Id.* He opined Plaintiff had an unlimited or very good ability to understand, remember, and carry out short and simple instructions. (Tr. 811-12). He opined Plaintiff had a "limited but satisfactory"[1] ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; manage regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; remember locations and work-like procedures; understand and remember detailed instructions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. *Id.* He further opined that Plaintiff was "seriously limited, but not precluded"[2] in the areas of: working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; setting realistic goals or making plans independently of others. *Id.* Dr. Fajobi noted he was "unable to evaluate" how often Plaintiff's impairment would cause him to be absent from work, or how much of an eight-hour workday Plaintiff's symptoms would cause him to be off-task. (Tr. 812). Dr. Fajobi did not opine Plaintiff was "unable to meet competitive standards" or had "no useful ability to function" in any area listed. *See* Tr. 811-12.

---

1. The form did not define this term. *See* Tr. 811.
2. The form defined "seriously limited, but not precluded" as "ability to function in this area is less than satisfactory, but not precluded in all circumstances. Individual would be limited in their ability to perform activity 15% of time." (Tr. 811).

*Consultative Examining Physician*

After her June 2015 consultative examination, Dr. Koricke opined that Plaintiff "would experience difficulty understanding how to perform and carry out complex tasks and would require supervision and structure to complete job duties accurately due to limited intellectual capacity." (Tr. 407). She opined that he would not have difficulty maintaining attention and concentration, or having the persistence and pace to perform tasks. *Id.* She opined that he was able to respond appropriately to supervision and coworkers "as long as instructions and job demands are presented to him in simple terms." (Tr. 407-08). Finally, Dr. Koricke opined that Plaintiff's "limited capacity causes him limited insight and judgment such that he would likely have difficulty fully processing work pressure and he [might] become confused when under pressure." (Tr. 408).

After her September 2015 consultative evaluation, Dr. Koricke opined Plaintiff would "likely have difficulties remembering and carrying out instructions related to his difficulties with concentration due to his difficulties with mood dysregulation and anxiety and his limitations in intellectual functioning." (Tr. 415). He also had "limitations in attention, concentration, and work place [sic] related to his difficulties with mood dysregulation, depression, and limitations in intellectual functioning." (Tr. 416). Dr. Koricke also noted Plaintiff had "limitations with regard to responding appropriately to supervision and coworkers in an employment setting due to his depression, symptoms of ADHD and his difficulties with limitations in intellectual functioning." *Id.* Finally, she opined Plaintiff had "limitations in his ability to respond appropriately to work pressures in an employment setting, due to difficulties with depression and poor tolerance for frustration." *Id.*

*State Agency Reviewing Physicians*

In July 2015, state agency reviewing psychologist Joseph Edwards, Ph.D., reviewed Plaintiff's records and offered a functional capacity opinion. (Tr. 96-100). Dr. Edwards opined that Plaintiff had mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 96). Dr. Edwards opined Plaintiff was not significantly limited in his ability to understand, remember, and carry out, short and simple instructions but that he would have moderate limitation with detailed instructions. (Tr. 98). Specifically, he explained that Plaintiff was "[a]ble to understand and remember simple 1-2 step steps [sic] and instructions" and the he could "carry out 1-2 step tasks in settings without strict time or production demands." (Tr. 98-99). Dr. Edwards also opined Plaintiff was moderately limited in his ability to interact with the general public, but not significantly limited in his ability to accept instructions and respond appropriately to criticism for supervisors. (Tr. 99).

In October 2015, Tonnie Hoyle, Psy.D., reviewed Plaintiff's records and affirmed Dr. Edwards's opinions. (Tr. 111-13).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 85-89) The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. (Tr. 86-87). The VE responded that such an individual could perform jobs such as cleaner II, dining room attendant, and retail trade bagger. (Tr. 87). The VE also testified that adding restrictions requiring frequent or constant supervision or being off-task for twenty percent of the day would preclude competitive work. (Tr. 88).

<u>ALJ Decision</u>

In his August 24, 2017 written decision, the ALJ found Plaintiff had not engaged in substantial gainful activity since his application date. (Tr. 28). He further found Plaintiff had severe impairments of unspecified episodic mood disorder, attention deficit hyperactive disorder, borderline intellectual functioning, and depressive disorder, but that none of these impairments – singly or in combination – met or equaled the severity of a listed impairment. (Tr. 28-29). The ALJ then set forth Plaintiff's RFC:

> [T]he claimant has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: never required to climb ladders, scaffolds or ropes; limited to hearing and understanding simple oral instructions; limited to communicating simple information; restricted from hazards such as heights or machinery but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles; never required to operate a motor vehicle during the course of a workday; limited to simple tasks; limited to routine and repetitive tasks; not able to perform at a production rate pace, such as assembly line work, but can perform goal-oriented work, such as an office cleaner; limited to simple work-related decisions with occasional interaction with supervisors; limited to occasional interaction with a small group of co-workers, where the contact is casual in nature; limited to occasional, superficial contact with the public; limited to tolerating few changes in a routine work sett[]ing, however, when said changes do occur, they would need to take place gradually and would occur infrequently.

(Tr. 31). The ALJ then found that considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 37). Therefore, the ALJ found Plaintiff not disabled from his application date through the date of the decision. (Tr. 38).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in

the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred in his consideration of the opinion evidence, specifically, that he did not explain his rejection of certain limitations in several opinions. *See* Doc. 13, at 13 ("The ALJ purported to assign 'partial' to 'great' weight to every psychological expert; despite this, the RFC finding omitted critical limitations offered by these experts."). The Commissioner responds that the opinion evidence is in large part consistent with the ALJ's RFC and that the decision is supported by substantial evidence. For the reasons discussed below, the undersigned finds no error and affirms the ALJ's decision.

RFC Generally

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). In formulating the RFC, an ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. 20 C.F.R. § 416.929. An ALJ must also consider and weigh medical opinions. 20 C.F.R. § 416.927. "The responsibility for determining a claimant's residual functional capacity

rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir.

2009) (citing 20 C.F.R. § 416.946(c)). An ALJ's RFC determination must be supported by

evidence of record, but it need not correspond to, or even be based on, any specific medical

opinion. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015). Instead, it is

the ALJ's duty to formulate a claimant's RFC based on all the relevant, credible evidence of

record, medical and otherwise. *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir.

2013); *see also Poe*, 342 F. App'x at 157 ("Moreover, an ALJ does not improperly assume the

role of a medical expert by assessing the medical and non-medical evidence before rendering a

residual functional capacity finding.").

Treating Physician Rule & Medical Opinion Evidence

      Generally, the medical opinions of treating physicians are afforded greater deference than

those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir.

2007); *see also* SSR 96-2p, 1996 WL 374188.[3] A treating physician's opinion is given

"controlling weight" if it is supported by (1) medically acceptable clinical and laboratory

diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case

record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to

give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, she

must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*,

710 F.3d 365, 376-77 (6th Cir. 2013).

      When the physician's medical opinion is not granted controlling weight, the ALJ must

---

3. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed his claim in April 2012 and thus the previous regulations apply.

give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

For medical sources who offer opinions but are not treating physicians, an ALJ is to consider the same factors. *See* 20 C.F.R. § 416.927(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion"). While "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has not performed an examination," ALJs have more discretion in considering non-treating source opinions. *Gayheart*, 710 F.3d at 375. Notably, they need not give "good reasons" for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016) ("But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("[T]he SSA requires ALJs to give reasons for only treating sources."). ALJs are not required to defer to such opinions of non-treating sources and

must only provide a meaningful explanation regarding the weight given to particular medical source opinions. *See* SSR 96-6p, 1996 WL 374180, at *2 ("Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions."); 20 C.F.R. § 416.927(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion").

Plaintiff challenges the ALJ's evaluation of the opinions of Drs. Fajobi, Koricke, Edwards, and Hoyle. The undersigned addresses each in turn below.

*Treating Physician - Dr. Fajobi*

Plaintiff contends the ALJ excluded from the RFC "Dr. Fajobi's limitations that Plaintiff would be unable, for 15% of the workday, to work in proximity to others without being distracted by them or exhibiting behavioral extremes, to complete a normal workday and workweek without interruptions from psychologically based symptoms, or to perform at a consistent pace without an unreasonable number and length of rest periods[.]" (Doc. 13, at 13) (citing Tr. 811-12). The Commissioner responds that Plaintiff "fails to point to any significant inconsistency between the ALJ's RFC and Dr. Fajobi's opinion." (Doc. 16, at 10).

The ALJ summarized Dr. Fajobi's opinion and assigned it "partial weight", explaining:

> The undersigned assigns Dr. Fajobi's opinion partial weight as it is consistent with the evidence as a whole, showing limitations in the claimant's ability to interact with others, respond to changes in a work setting, and responding appropriately to criticism (8E; 4F; 5F; 8F). However, the undersigned finds that the claimant is slightly more limited in his ability to carry out detailed instructions, which is supported by Dr. Koricke's findings that the claimant had difficulties remembering and carrying out instructions related to his difficulty with concentration (5F/7).

(Tr. 36). That is, the ALJ assigned Dr. Fajobi's opinion partial weight because he found Plaintiff *more* limited in his ability to carry out detailed instructions. *See id.*

The undersigned agrees with the Commissioner that the ALJ's RFC accommodated Dr. Fajobi's opinion. First, Dr. Fajobi found Plaintiff would be "seriously limited but not precluded" in the following areas related to "sustained concentration and persistence limitations": 1) work in coordination with or in proximity to others without being distracted by them; 2) complete a normal workday and workweek without interruptions from psychologically based symptoms; and 3) perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 811). The form defined "seriously limited, but not precluded" as "ability to function in this area is less than satisfactory, but not precluded in all circumstances. Individual would be limited in their ability to perform activity 15% of time." *Id.* The ALJ's RFC reasonably accommodated these restrictions in limiting Plaintiff to: 1) "occasional interaction with a small group of co-workers, where the contact is casual in nature"; and 2) simple, routine, and repetitive tasks, but "not able to perform at a production rate pace, such as assembly line work." (Tr. 31).

Second, Dr. Fajobi opined that Plaintiff would be "seriously limited" in getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 812). Again, the ALJ's RFC reasonably accommodated this restriction by limiting Plaintiff to "occasional interaction with a small group of co-workers, where the contact is casual in nature". (Tr. 31).

Third, Dr. Fajobi opined Plaintiff had adaptation limitations, and would be "seriously limited but not precluded" in the areas of: 1) responding appropriately to changes in the work setting; 2) being aware of normal hazards and taking appropriate precautions; and 3) setting realistic goals or making plans independently." (Tr. 812). Again, the ALJ's RFC accommodated these restrictions by finding Plaintiff: 1) restricted from hazards such as heights or machinery but able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or

approaching people or vehicles" and 2) "limited to tolerating few changes in a routine work sett[]ing, however, when said changes do occur, they would need to take place gradually and would occur infrequently." (Tr. 31).

Plaintiff seemingly conflates the "would be limited in their ability to perform activity 15% of the time" language of the form's definition with an opinion that he would be "off task" for that portion of time. *See* Doc. 13, at 15 ("[T]he VE testified that an individual who is off task for more than 10% of the workday or requires at least frequent supervision is unable to maintain competitive employment. Tr. 88-89. Thus, the VE's testimony demonstrates that the limitations opined by Drs. Koricke and Fajobi are work-preclusive."). However, Dr. Fajobi expressly stated that he was "unable to evaluate" how much of an eight-hour workday Plaintiff would "be off task from performing job tasks". (Tr. 812). Instead, the form's definition states that Plaintiff would "be limited" in these areas for 15% of the day. The undersigned finds that the ALJ's RFC reasonably accounts for these limitations.

For these reasons, the undersigned finds Plaintiff has not shown reversible error in the ALJ's consideration of Dr. Fajobi's opinion. The ALJ is tasked with the ultimate RFC determination. *Poe*, 342 F. App'x at 157 (citing 20 C.F.R. § 416.946(c)). And, any error in consideration of a treating physician opinion is harmless where the ALJ makes findings consistent with that opinion. *See, e.g., Johnson–Hunt v. Comm'r of Soc. Sec.,* 500 F. App'x 411, 419 (6th Cir. 2012) (citing *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011)).[4]

---

4. Moreover, as the Commissioner points out, it does not appear even Dr. Fajobi believed his opinion to be work-preclusive. First, Dr. Fajobi did not indicate that Plaintiff was "unable to meet competitive standards", meaning "your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting" as to *any* functional ability. *See* Tr. 811-12. Second, in response to a prompt to "[d]escribe the *clinical findings* including results of mental status examination that demonstrate the severity of your patient's mental impairment and symptoms", Dr. Fajobi wrote: "alert, oriented x 3, cooperative,

*Examining Physician - Dr. Koricke*

Plaintiff secondly argues that the ALJ "excluded Dr. Koricke's limitation that Plaintiff 'would require supervision and structure to complete job duties accurately due to limited intellectual capacity.'" (Doc. 13, at 13) (quoting Tr. 407). This language is contained in Dr. Koricke's June 2015 opinion. *See* Tr. 407. The Commissioner responds that this language is limited to complex tasks, and thus "immaterial to Plaintiff's argument, as the ALJ limited Plaintiff to, among other things, simple, routine, and repetitive tasks." (Doc. 16, at 13 n.6).

The ALJ addressed Dr. Koricke's opinions twice. First, he summarized the findings therein (Tr. 33-34), and stated:

> In examining the two reports from Dr. Koricke, the undersigned notes that her reports had some internal consistencies. Namely, Dr. Koricke found that the claimant could not complete the serial 7s task at either examination, he was functioning at a borderline range of intelligence and he had difficulty relating to and/or interacting with others. Considering the claimant's education records and the consistencies between the two consultative examinations, the undersigned finds that the claimant is limited to simple, routine and repetitive tasks, simple work-related decisions and occasional interaction with others.

(Tr. 34). Later, in evaluating the opinion evidence, the ALJ explained:

> As indicated previously, there are some consistencies between the two reports such as the claimant's range of intelligence and difficulties interacting with others. However, based on the inconsistencies in the reports, the undersigned accords partial weight to Dr. Koricke's June 3, 2015, opinion, and great weight to Dr. Koricke's September 30, 2015, opinion. On June 3, 2015, Dr. Koricke opined that the claimant would experience difficulty understanding how to perform and carry out complex tasks, and would require supervision and structure to complete job duties accurately due to limited intellectual capacity (4F/9). Dr. Koricke stated that the claimant was able to respond appropriately to supervision and to co-workers in a work setting as long as instructions and job demands are presented to him in simple terms (4F/9-10). Dr. Koricke further opined on June 3, 2015, that the claimant would likely have difficulty fully processing work pressure and he may become confused when under pressure (4F/10). The undersigned assigns this opinion partial weight as it is consistent with the educational records and medical

speech normal rate and tone, thoughts logical [and] organized with poor fund of knowledge, mood euthymic, affect appropriate" (Tr. 811) (emphasis in original).

records showing that the claimant had difficulty understanding complex tasks (3F/4). However, the record shows that the claimant would have problems responding appropriately to supervisors and co-workers, as he has a history of aggressive behavior towards his teachers and is quick to get frustrated (8E; 8F/7).

(Tr. 35)

Again, Plaintiff contends the ALJ excluded, without explanation, Dr. Koricke's opinion that Plaintiff "would require supervision and structure to complete job duties accurately due to limited intellectual capacity." (Tr. 407). Preliminarily, the parties disagree over the meaning of Dr. Koricke's language. In full, the referenced sentence (and the previous sentence, included for context) state:

He understood simple questions and instructions, but had trouble following multi-step or complex instructions, which had to be broken down into small segments of information for him to understand. He would experience difficulty understanding how to perform and carry out complex tasks, and would require supervision and structure to complete job duties accurately due to limited intellectual capacity.

(Tr. 407). The Commissioner argues the "complex tasks" phrase in the sentence also modifies the "would require supervision to complete job duties accurately" language of the sentence, and thus the argument is immaterial because the ALJ limited Plaintiff to simple, routine, and repetitive tasks. (Doc. 16, at 13 n.6). Plaintiff responds that the Commissioner's "interpretation makes no sense as, in context, Dr. Koricke was plainly describing *two aspects* of Plaintiff's mental limitations[:] his inability to perform complex tasks <u>and</u> his need for supervision and structure to complete job duties." (Doc. 17, at 5-6) (emphasis in original). Read in the context of the prior sentence, the undersigned agrees with the Commissioner's reading that the supervision requirement relates to complex tasks.

However, even under Plaintiff's reading, the undersigned would find no error. This is so because the Sixth Circuit has rejected the argument that an ALJ must explain every omitted restriction from a non-treating physician's opinion. For example, in *Martin*, the plaintiff

19

challenged an ALJ's failure to either include – or explain his omission of – certain opined restrictions from a State agency reviewing physician and a one-time consultative examiner in an RFC. 658 F. App'x at 258 ("Martin also argues that the ALJ failed to explain why certain aspects of two opinions by non-treating sources were omitted from his RFC."). The Sixth Circuit found no error:

> Martin protests the ALJ's lack of explanation as to why Martin's marked impairment in interacting with the general public—as found by Dr. Joslin—and his moderate to marked impairment in his ability to sustain concentration—as found by Dr. Rutledge—were not explicitly incorporated into Martin's RFC. But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions. *See Smith*, 482 F.3d at 876 ("[T]he SSA requires ALJs to give reasons for only *treating* sources."); *see also Reeves v. Comm'r of Soc. Sec.*, 618 Fed.Appx. 267, 273 (6th Cir. 2015) (same).

*Id.* at 259; *see also Ellsworth v. Comm'r of Soc. Sec.*, 2016 WL 11260325, at *12 (N.D. Ohio) ("This court has frequently denied remand on this issue and confirmed that there is no legal requirement for an ALJ to explain or adopt every limitation or restriction opined by a state agency nonexamining physician, even when the ALJ has given the opinion 'great' or 'significant' weight.") (collecting cases), *report and recommendation adopted*, 2017 WL 2857619.

In the instant case, the ALJ recognized that Plaintiff would be limited by his intellectual capacity. As such, he limited Plaintiff to: 1) hearing and understanding simple oral instructions; 2) communicating simple information; 3) simple, routine, and repetitive tasks, 4) no production rate pace; 5) simple work-related decisions; 6) few changes in a routine work setting; changes that take place gradually and occur infrequently. (Tr. 31). As with the above analysis of Dr. Fajobi's opinion, the undersigned finds these restrictions adequately account for the restrictions opined by Dr. Koricke and no further explanation was required.

Finally, Plaintiff also argues the ALJ failed to include Drs. Edwards and Hoyle's limitations to understanding and remembering one to two step tasks, carrying out one to two step tasks in settings without strict time or production demands, and having major changes explained ahead of time. (Doc. 13, at 13) (citing Tr. 98-99, 111-12). The Commissioner responds that the ALJ was not required to adopt each restriction or provide a detailed explanation for each. (Doc. 16, at 14). Further, the Commissioner again contends that Plaintiff has not shown a significant inconsistency between the opinions cited and the ALJ's RFC. *Id.* at 14.

> The ALJ addressed these opinions together, assigning them partial weight:
>
> The undersigned accords these opinions partial weight as they are consistent with the medical evidence as a whole, showing the claimant's aggression towards others and lack of focus (8E; 8F). however, the undersigned finds that the claimant is more limited than opined by Dr. Edwards and Dr. Hoyle, as the record shows that the claimant presented with a disheveled appearance and he had difficulty with understanding and remembering (4F/5, 9; 5F/5, 7).

(Tr. 34-35).

Again, as noted above, the final determination of the RFC is reserved to the Commissioner. 20 C.F.R. § 416.945(a)(3). And the reasons-giving requirement does not apply to reviewing State agency physicians. *Martin*, 658 F. App'x at 259; *Ellsworth*, 2016 WL 11260325, at *12. Further, the undersigned agrees with the Commissioner in part that Plaintiff had not shown a significant inconsistency between the opinions and the ALJ's RFC. Preliminarily, Plaintiff cites Drs. Edwards's and Hoyle's limitation that he should have "any major changes explained to him ahead of time." (Doc. 13, at 13) (citing Tr. 98-99, 111-12); *see* Tr. 99, 112 ("Clmt capable of performing static tasks in a setting with no strict time and production demands. Major changes should be explained ahead of time and implemented gradually."). The undersigned finds this restriction more than adequately covered by the ALJ's RFC, which limited

Plaintiff to "tolerating few changes in a routine work setting" and "when said changes do occur, they would need to take place gradually and would occur infrequently." (Tr. 31). To the extent there is some difference in the language (e.g., "explained ahead of time", Tr. 99, 112), any such difference falls within the ALJ's authority to evaluate all the evidence and determine the RFC. *See* 20 C.F.R. § 416.945(a)(3).

Second, Plaintiff points to the State agency physicians' limitation to "one to two step tasks". He contends that these opinions "are critical because the jobs identified by the VE and relied upon to deny benefits . . . involve more than 1 to 2 steps." (Doc. 13, at 15). In addressing a similar argument, a court in the Southern District of Ohio explained:

> As an initial matter, the Court finds that the state agency psychologists' limitations and the ALJ's limitations are not, as Plaintiff suggests, "materially different." Plaintiff bases his argument on two subtle discrepancies between the wording of the state agency psychologists' opinions and that of the ALJ's RFC. First, Plaintiff alleges that the ALJ erred because one of the state agency psychologists, Dr. Todd, limited Plaintiff to simple 1-2 step tasks, whereas the ALJ limited Plaintiff to "simple routine tasks." . . . The Court finds that the ALJ did not err in choosing not to adopt the exact limitations proposed by the state agency consultants.

> Plaintiff concedes that the ALJ was not required to adopt these opinions in whole. However, Plaintiff claims that because the ALJ gave "partial weight" to the state agency psychologists, "the ALJ should have at least explained the rationale behind his decision and explained either why they were omitted or how they are properly accounted for in the residual functional capacity." However, because the state agency psychologists are not treating sources, the ALJ was not subject to the "good reasons" requirement. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

*Ferguson v. Comm'r of Soc. Sec.*, 2019 WL 2414684, at *5 (S.D. Ohio) (internal pleading and transcript citations and footnote omitted) (report and recommendation). The court then cited *Martin*, 658 F. App'x 255, and concluded:

> Plaintiff's similar argument fares no better here. As Plaintiff recognizes, the ALJ was under no obligation to adopt the state agency psychologists' opinions in full. *See Harris v. Comm'r of Soc. Sec. Admin.*, No. 1:13-CV-00260, 2014 WL

346287, at *11 (N.D. Ohio Jan. 30, 2014) ("[E]ven where an ALJ provides 'great weight' to an opinion, an ALJ is not necessarily required to adopt wholesale limitations contained therein."). Nor, as the case law above makes clear, was the ALJ required to explain why he did not adopt their opinions in full. *See, e.g.*, *Martin*, 658 F. App'x at 259. The state agency psychologists are non-treating sources, and the ALJ evaluated their opinions accordingly. As such, the ALJ did not commit reversible error when formulating his RFC.

*Id.*

The same rationale applies here. Moreover, in this case, the ALJ provided significant limitations to accommodate Plaintiff's intellectual and understanding restrictions, including: 1) limited to hearing and understanding simple oral instructions; 2) limited to communicating simple information; and 3) limited to simple, routine, and repetitive tasks. (Tr. 31). Most importantly, as noted above, the ALJ was not required to provide "good reasons" for not including the "one to two step task" limitation from a non-treating physician's opinion. *See Martin*, 658 F. App'x at 259; *Ellsworth*, 2016 WL 11260325, at *12. Further, elsewhere in his opinion, the ALJ explained that Dr. Koricke's consultative examinations provided support for the simple, routine, repetitive task restriction in the RFC:

> In examining the two reports from Dr. Koricke, the undersigned notes that her reports had some internal consistencies. Namely, Dr. Koricke found that the claimant could not complete the serial 7s task at either examination, he was functioning at a borderline range of intelligence and he had difficulty relating to and/or interacting with others. Considering the claimant's education records and the consistencies between the two consultative examinations, the undersigned finds that the claimant is limited to simple, routine and repetitive tasks, simple work-related decisions and occasional interaction with others.

(Tr. 34). Additionally, treating physician Dr. Fajobi opined Plaintiff had an "unlimited or very good" ability to carry out very short and simple instructions" and a "limited but satisfactory" ability to carry out detailed instructions, or maintain attention and concentration for extended periods." (Tr. 811). The ALJ found Plaintiff was "slightly more limited [than Dr. Fajobi found] in his ability to carry out detailed instructions, which is supported by Dr. Koricke's findings that

the claimant had difficulties remembering and carrying out instructions related to his difficulty with concentration[.]." (Tr 36). The undersigned finds that these explanations and substantial evidence of record supports the ALJ's decision to include in the RFC a limitation to simple, routine, and repetitive tasks (and implicit rejection of the State agency physician limitation to one to two step tasks). *See Freeman v. Comm'r of Soc. Sec.*, 2013 WL 3580393, at *9 (N.D. Ohio) (finding substantial evidence supported "the ALJ's implicit rejection" of a state agency physician's opined restriction).

*Gayheart* and *Wilson*, cited by Plaintiff, address treating physician opinions, and do not provide otherwise. As the Sixth Circuit explained in response to a similar argument in *Martin*:

> Martin claims that the ALJ's lack of explanation flouts our decision in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013). There, the court faulted the ALJ for applying a more critical standard of scrutiny to the treating source's opinions than he did to opinions of several non-treating doctors. *Id.* at 379–80. Specifically, the court held that the inconsistencies the ALJ found in the treating source's opinions could not "constitute 'good reasons' for affording them little weight when more flagrant inconsistencies [went] unquestioned in the medical opinions to which the ALJ deferred." *Id.* at 380. We struggle to see how *Gayheart* applies to Martin's argument, as he never posits that the ALJ erred in crediting the non-treating sources' opinions over those of a treating source. He argues instead that the ALJ failed to explain reasons for *rejecting* portions of the non-treating source's opinions. Thus, his reliance on *Gayheart* is misplaced.

658 F. App'x at 259.

Plaintiff sees the facts differently, and argues that "[c]ritically, *none of [the ALJ's] findings* are inconsistent with the above-identified limitations offered by the psychological experts". (Doc. 13, at 14) (emphasis in original); *see also* Doc. 17, at 2 n.1 (listing findings Plaintiff asserts are consistent with the allegedly-omitted limitations). However, this Court cannot reverse even if substantial evidence or indeed a preponderance of the evidence supports Plaintiff's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Substantial evidence supports the ALJ's decision here. The

restrictions cited by Plaintiff are ultimately differences in interpretation, and in degree, rather than entirely-ignored limitations. For the reasons set forth above, in light of the fact that it is the ALJ's duty to review all the evidence and formulate the RFC, *Poe*, 342 F. App'x at 157; 20 C.F.R. § 416.946(c), and that an ALJ's RFC determination must be supported by evidence of record, but it need not correspond directly to a single medical opinion, *Brown*, 602 F. App'x at 331, the undersigned finds Plaintiff has identified no reversible error.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and affirms that decision.

 s/James R. Knepp II
United States Magistrate Judge